UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| SHAWN MILNER,<br>    *Plaintiff*,<br><br>    v.<br><br>SHARRON LAPLANTE *et al.*,<br>    *Defendants*. | No. 3:18-cv-00903 (JAM) |

### ORDER RE CROSS MOTIONS FOR SUMMARY JUDGMENT

Plaintiff Shawn Milner is a prisoner in the custody of the Connecticut Department of Correction ("DOC"). He has filed this *pro se* and *in forma pauperis* action principally alleging that prison officials were deliberately indifferent to his safety and serious medical needs. The defendants now move for summary judgment on grounds that Milner failed to exhaust his administrative remedies and that no genuine issue of fact supports Milner's claims. Milner cross-moves for summary judgment in his favor.

For the reasons set forth below, I will grant the defendants' motion as to all but one of the defendants on the ground that Milner did not properly exhaust his claims against these defendants. As for the remaining defendant—Dr. Sharron Laplante—I will deny the motions of both parties for summary judgment because there remain genuine fact issues for trial concerning whether Dr. Laplante was deliberately indifferent to Milner's serious medical needs.

### BACKGROUND

Milner filed this action against the following seven defendants: Dr. Sharron Laplante; Warden Allison Black; Lieutenant Rivera; Nurse Chris; Nurse Denise; Nurse Joe; and Nurse Michael. Milner alleges that these defendants violated his rights while he was a pre-trial detainee at the Hartford Correctional Center ("HCC") in the spring of 2018.

1

I issued an initial review order that dismissed some of Milner's claims and allowed others to proceed. *See Milner v. Laplante*, 2019 WL 79428 (D. Conn. 2019). I allowed Milner's claim against all seven of the defendants for deliberate indifference to his serious medical needs and I also allowed Milner's claim against one of the defendants (Nurse Joe) for allegedly confining Milner for an overnight stay without clothing in the medical unit. *Id.* at *5.

The defendants now move for summary judgment on two grounds. Docs. #44, #80. First, they argue that Milner failed to exhaust his administrative remedies. Second, they argue that there is no genuine issue of fact to support Milner's claims. Milner in turn cross-moves for summary judgment in his favor. Docs. #51, #84.[1]

## DISCUSSION

The principles governing my review of a motion for summary judgment are well established. Summary judgment may be granted only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). I must view the facts in the light most favorable to the party who opposes the motion for summary judgment and then decide if those facts would be enough—if eventually proved at trial—to allow a reasonable jury to decide the case in favor of the opposing party. My role at summary judgment is not to judge the credibility of witnesses or to resolve close and contested issues but solely to decide if there are enough facts that remain in dispute to warrant a trial. *See generally Tolan v. Cotton*, 572 U.S. 650, 656-57 (2014) (*per curiam*); *Benzemann v. Houslanger & Assocs., PLLC*, 924 F.3d 73, 78 (2d Cir. 2019).

---

[1] The docket reflects that the defendants' initial summary judgment motion was denied as moot after I dismissed this action for failure of Milner to advise the Court of his current address. Doc. #65. I later granted Milner's motion to re-open and defendants renewed their summary judgment motion. Docs. #71, #80. Although Milner did not formally file an objection or response to defendants' renewed motion, I consider his multiple filings with respect to the initial summary judgment motion. *See* Docs. #51, #51-1, #54, and #59.

Because Milner is a *pro se* party, his pleadings and submissions on summary judgment must be given a liberal construction. "The policy of liberally construing *pro se* submissions is driven by the understanding that implicit in the right to self-representation is an obligation on the part of the court to make reasonable allowances to protect *pro se* litigants from inadvertent forfeiture of important rights because of their lack of legal training." *McLeod v. Jewish Guild for the Blind*, 864 F.3d 154, 156 (2d Cir. 2017) (*per curiam*) (internal quotations and citation omitted). The Court's local rules ensure that a *pro se* party is thoroughly advised of the procedural requirements for opposing a summary judgment motion, *see* D. Conn. L. Civ. R. 56(b), and the defendants here have complied with the rule's requirement to serve on Milner a notice detailing the rules that govern a motion for summary judgment. Doc. #44-9. A party's *pro se* status does not relieve the party of the obligation to respond to a motion for summary judgment and to support the party's claims with evidence as the rules require. *See Nguedi v. Fed. Reserve Bank of New York*, 813 F. App'x 616, 618 (2d Cir. 2020).

### *Exhaustion of administrative remedies*

The Prison Litigation Reform Act of 1995 ("PLRA"), 42 U.S.C. § 1997e(a), states that "[n]o action shall be brought with respect to prison conditions . . . by a prisoner . . . until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). This exhaustion requirement applies to all claims regarding "prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002). Exhaustion of all available administrative remedies must occur regardless of whether the remedies can provide the relief that the prisoner seeks. *See Booth v. Churner*, 532 U.S. 731, 740-41 (2001). Furthermore, prisoners must comply

with all procedural rules regarding the grievance process prior to commencing an action in federal court. *See Woodford v. Ngo*, 548 U.S. 81, 90-93 (2006).

Importantly, a prisoner is required to exhaust only those administrative remedies that are "available." 42 U.S.C. § 1997e(a); *see Ross v. Blake*, 136 S. Ct. 1850, 1858 (2016). An administrative remedy is unavailable when: (1) it "operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates"; (2) the administrative scheme is so opaque that it becomes incapable of use by the "ordinary prisoner," who cannot "discern or navigate it" or "make sense of what it demands"; or (3) prison administrators "thwart inmates from taking advantage of it through machination, misrepresentation, or intimidation." *Id.* at 1859-60.

The DOC has two administrative grievance procedures of consequence to this action. The first is a procedure that is specific to matters relating to the provision of health services. *See* DOC Administrative Directive 8.9 ("AD 8.9").[2] The second is a procedure that governs prisoner complaints more generally. *See* DOC Administrative Directive 9.6 ("AD 9.6").[3]

AD 8.9 contemplates at least three stages of review for a prisoner seeking a remedy for complaints relating to health services. *See Minnifield v. Dolan*, 2017 WL 1230840, at *6 (D. Conn. 2017) (describing requirements of AD 8.9). The first stage is informal resolution, whereby a prisoner must attempt to resolve the issue face-to-face with an appropriate staff member "or" via written request for resolution to a supervisor on an Inmate Request Form (CN 9601). *See* AD 8.9(10). The prisoner must clearly state the problem and remedy requested. *Ibid.* If the prisoner makes a written request, a prison official must respond within 15 business days. *Ibid.*

---

[2] AD 8.9 is available at *Administrative Remedy for Health Services*, CONN. DEP'T OF CORR., https://portal.ct.gov/DOC/AD/AD-Chapter-8 (last visited Feb. 24, 2021).
[3] AD 9.6 is available at *Inmate Administrative Remedies*, CONN. DEP'T OF CORR., https://portal.ct.gov/DOC/AD/AD-Chapter-9 (last visited Feb. 24, 2021).

The second stage is the filing of a formal request for one of two types of Health Services Review ("HSR"): Diagnosis and Treatment; or Review of an Administrative Issue. To do this, the prisoner must submit an Inmate Administrative Remedy Form (CN 9602) seeking a review of either "a diagnosis or treatment, including a decision to provide no treatment," or "a practice, procedure, administrative provision or policy, or an allegation of improper conduct by a health services provider." AD 8.9(9); AD 8.9(11). For diagnosis and treatment reviews, the HSR Coordinator must schedule an appointment with an appropriate health care provider to determine a proper course of action, if any. AD 8.9(11)(A). For reviews of an administrative issue, the HSR Coordinator must render a disposition within 30 days. AD 8.9(12)(A).

The third stage under AD 8.9 is the filing of an appeal. To do this, the prisoner must file an Appeal of Health Services Review (CN 8901) within 10 business days of receiving the unsatisfactory disposition. AD 8.9(12)(B). Notably, the directive does not instruct prisoners about what to do if they receive no response to their HSR. The health services provider must respond within 15 business days of receipt of the appeal. AD 8.9(12)(C). If the prisoner is challenging DOC policies directly, as opposed to compliance with existing policies, he may then appeal to the DOC Director of Health Services within 10 business days of receipt of the provider's response. AD 8.9(12)(D).

The DOC's grievance procedure for more general matters is set forth separately in AD 9.6. *See Riles v. Buchanan*, 656 F. App'x 577, 579-80 (2d Cir. 2016) (describing requirements of AD 9.6).[4] It is similar to but in some ways distinct from the medical grievance procedure. Both require that prisoners first pursue informal resolution, although for general grievances, prisoners "may" pursue verbal resolution but, if that fails, "shall" submit an Inmate Request Form. AD

---

[4] AD 9.6 is available at *Inmate Administrative Remedies*, CONN. DEP'T OF CORR., https://portal.ct.gov/DOC/AD/AD-Chapter-9 (last visited Feb. 22, 2021).

9.6(6)(A). A prison official must respond to the written request within 15 business days. *Ibid.* If the response is unsatisfactory or if there is no response, the second stage of the AD 9.6 procedure is for prisoners to file a formal Level 1 grievance on an Inmate Administrative Remedy Form within 30 calendar days of the incident that gave rise to the grievance. AD 9.6(6)(C). An official must respond within 30 business days of receipt of the Level 1 grievance. AD 9.6(6)(I). The third stage is the filing of a Level 2 grievance on an Inmate Grievance Appeal Form (CN 9604) to the District Administrator within 5 calendar days of receiving the unsatisfactory disposition or after no response. AD 9.6(6)(D), (I), and (K). An official must respond within 30 business days of receipt of the Level 2 grievance. AD 9.6(6)(K). Under certain circumstances, a prisoner may within 5 calendar days of receipt of that disposition file a Level 3 grievance. AD 9.6(6)(L).

The defendants argue that Milner did not attempt informal resolution of his medication-related grievance, timely file the correct form to appeal the unfavorable disposition of that grievance, or pursue any administrative remedies for his other claims. Doc. #44-1 at 5-7. Nurse Lisa McDermott, the keeper of medical records for HCC detainees, avers that she researched Milner's Inmate Requests and HSRs. Doc. #44-3 at 2. She found that Milner filed only one HSR on April 19, 2018, which was responded to on April 21, 2018, and then filed a Level 2/3 Grievance Appeal on May 28, 2018. *Ibid.* An attached screenshot of a DOC webpage reveals only one filing by Milner while he was detained at HCC. *Id.* at 5.

On an Inmate Administrative Remedy Form dated April 19, 2018, Milner requested a Review of an Administrative Issue, the second stage of filing a medical grievance, alleging that he was not being provided with the proper dosages of his anti-seizure medications nor his pain and anxiety medications. *Id.* at 6-7.[5] He notes at the top of this form that he completed the first

---

[5] Milner's administrative complaint of April 19, 2018 states as follows:

6

stage of filing a medical grievance through "Informal Resolution taken with Nurse Nicole." *Id.* at 7.

In the "Official Use Only" section, the form is marked received on April 21, 2018, and "[r]eturned without disposition." *Ibid.* Milner was requested to "[p]er policy, please attempt an informal resolution prior to filing a grievance," which "is done through the sick call process or via an inmate request." *Ibid.*

On an Inmate Grievance Appeal Form dated May 28, 2018, the third stage of filing a general rather than a medical grievance, Milner noted that he submitted a Level 1 grievance over 30 days prior "due to being denied his medications"—an apparent reference to his filing of April 19, 2018—and that he had not yet received a response. *Id.* at 8. The "Official Use Only" section is not dated or signed by prison staff, but it states, "No review undertaken per policy." *Ibid.*

As to Milner's medication-related grievance of April 19, 2018, I find that there is a fact issue whether he properly pursued informal resolution. Milner contemporaneously alleged he pursued informal resolution with a "Nurse Nicole." Because he did not submit an Inmate Request Form, I construe this allegation to mean that he raised the medication issue face-to-face with the nurse, having had the option of doing so under AD 8.9. The defendants dispute that he properly pursued informal resolution, but the only submissions they provide to that end are

---

> This writer has a diagnosed seizure disorder, an[x]iety disorder as well as chronic head and back pains that he was prescribed medication to treat. However this writer is not being provided the proper doses of his seizure meds, which have caused this writer to suffer withdrawal seizures in his cell on 4/1[] and led to his injury. Further this writer is not being provided his pain or anxiety medications even though they were prescribed for his treatment. Although this writer diligently continues to notify medical staff that he is being denied his medications unreasonably, no action has been taken to remedy the above depicted unconstitutional conduct. In resolution this writer would simply like to be provided all of his medications to prevent future injuries and to ensure that adequate medical care is provided. Thank you.

Doc. #44-3 at 7 (capitalization normalized). Although the date of the alleged seizure is cut off on this form, it appears that Milner claims a seizure incident occurred on April 17, 2018.

contrary assertions by the official who reviewed his grievances. They do not, for example, claim that this "Nurse Nicole" to whom Milner refers does not exist, that he did not actually complain to her about his medications, that he did not do so face-to-face, or that she was not an appropriate official within the meaning of AD 8.9(10).

On the contrary, Milner alleged in his verified complaint that he complained about his dosages to a nurse on April 13, 2018, and then to every nurse who distributed medication to him from April 13 to May 21, 2018. Doc. #1-1 at 6. I consider these allegations of the verified complaint as akin to averments that may be considered for summary judgment purposes. *See D'Andrea v. Nielsen*, 765 F. App'x 602, 603 n.1 (2d Cir. 2019).

I also find a fact issue as to whether Milner received a response to his initial grievance and therefore whether his appeal was timely or otherwise filed on the correct form. Even though his HSR was officially marked received and returned, Milner stated on his appeal form that he never received a response to the HSR. This is consistent with the allegation in his briefing that the defendants did not respond to "several" of his grievances and would not "return or document that they received some of the grievances [he] filed." Doc. #51 at 16. Although Milner alleges on the next page of his briefing that he "was given final responses," *id.* at 17, I read this as consistent with his allegation of unresponsiveness in that he believed the nonresponses to "several" of his grievances were effectively "final responses."

Again, the defendants have provided little more than the fact that his HSR was marked returned during the review process before it was actually returned. I am left with another credibility determination that cannot be resolved at the summary judgment stage. *See Moore v. Feinerman*, 515 F. App'x 596, 599 (7th Cir. 2013) (noting that prisoner's allegation that prison did not respond to his grievance depended on his credibility); *cf. Dearduff v. Washington*, 2017

8

WL 4038890, at *5 (E.D. Mich. 2017). Even if Milner was required to appeal the alleged nonresponse, he presumably had at least 30 calendar days to wait for the response as provided for in AD 8.9, then 10 business days to respond. He appealed his HSR within 40 calendar days of filing it, which was timely.

Consequently, I am being asked to find that Milner failed to exhaust his administrative remedies solely because he filed the "wrong" appeal form, which otherwise made plain what he was appealing. Milner filed an Inmate Grievance Appeal Form under AD 9.6 when, the defendants claim, he should have filed an Appeal of Health Services Review under AD 8.9. But it is far from clear that Milner in fact submitted the wrong form because, unlike AD 9.6—which instructs prisoners to move on to the next stage of the grievance process if they receive no response to a filing within a designated timeframe—AD 8.9 does not instruct prisoners on what to do if they receive no response to their HSR. Therefore, it is not apparent that Milner was even required to appeal in order to exhaust, let alone to do so on a specific form. *See Ramirez v. Allen*, 2018 WL 5281738, at *6 (D. Conn. 2018) (denying failure-to-exhaust defense because AD 8.9 "makes no provision for filing an appeal if a timely response to the grievance is not received" and "[t]hus, it is not clear that the plaintiff was required to file an appeal until he received a response to his Health Services Review grievance").

Milner may well have thought to file an appeal form under AD 9.6 precisely because it, unlike AD 8.9, instructs prisoners to do so in the event of a nonresponse. If he did, it is not clear this was error. AD 9.6 provides that its general grievance procedure applies to "all matters subject to the Commissioner's authority that are not specifically identified in Sections 4(B) through 4(I) of this Directive"; AD 8.9 is identified only in section 4(L). AD 9.6(4)(A). If Milner erred by filing one appeal form and not another, it was because the DOC's directives are unclear

on this point such that AD 8.9's appeal remedy would be practically unavailable to a similarly situated ordinary prisoner. *See, e.g.*, *Williams v. Corr. Officer Priatno*, 829 F.3d 118, 126 (2d Cir. 2016) (finding procedure for appealing an unfiled and unanswered grievance to be prohibitively opaque because it "plainly do[es] not describe a mechanism for appealing" such a grievance); *Brengettcy v. Horton*, 423 F.3d 674, 682 (7th Cir. 2005) (rejecting exhaustion defense where prison's policy did not instruct prisoner on what to do if officials failed to respond to his grievance).

Accordingly, I conclude that there is a genuine issue of fact whether Milner properly exhausted his claims that were raised in his grievance of April 19, 2018. But much of Milner's complaint in this action concerns alleged misconduct by the DOC that occurred *after* April 19, 2018. The record shows no genuine issue of fact to suggest that Milner properly exhausted his administrative remedies for any of the alleged conduct that occurred after April 19, 2018. Rebecca Schaffer, HCC's Grievance Coordinator, avers that she researched all of Milner's grievance filings from April 13 to November 16, 2018. Doc. #44-4 at 2. She found that he filed two grievances, two disciplinary report appeals, and one high security appeal during that timeframe. *Ibid.* The defendants have submitted filings from Milner matching those descriptions, and it is clear that none of these grieve the misconduct alleged in the complaint. *Id.* at 4-55.

Milner does not allege that these records are false or incomplete; to the contrary, he attaches many of them to his own response. Doc. #51-1. Milner argues that he did not have to file more grievances because this would be in violation of the rule that bars prisoners from filing repetitive grievances. Doc. #51 at 17. I do not agree. The provisions he relies on state that a prisoner may not file a repetitive grievance if a "response has been provided [to a prior grievance] *and there has been no change in circumstances that would affect the response*." Doc.

#51-1 at 24-25 (reproducing copies of 9.6.E.7 and 9.6.O.3) (emphasis added). Because he was told that his grievance of April 19, 2018 was procedurally denied for failure to attempt an informal resolution or to file an inmate request, *see* Doc. #44-3 at 7, it is clear that Milner was on notice that he could have filed a subsequent grievance to describe the later alleged and continuing misconduct and also to explain how he had engaged in the required informal resolution or made an inmate request, such that there would be a substantive response to his grievance.

Milner further argues that exhaustion was not required because of a Correctional Managed Health Care policy that "[e]mergency services shall be . . . readily accessible to all . . . [DOC] inmates." Doc. #51 at 15 (¶ 10) (citing Doc. #51-1 at 17); *see also* Doc. #54 at 2 (¶ 7), 5 (¶ 18) (reciting the same arguments). But this provision has nothing to do with a prisoner's obligation to file an internal grievance before filing a federal court complaint.

Milner next argues that the defendants' summary judgment motion is premature in light of the defendants' non-compliance with discovery, namely their failure to provide him copies of his master file and medical file as well as video footage of the unit in which his cell is housed. Doc. #51 at 16. Beyond conclusorily stating that the requested files are "very relevant to this matter," *ibid.*, Milner has not identified how "any specific discoverable information" sought would dispute any of the defendants' evidence on the issue of whether he properly exhausted his administrative remedies. *See Vega v. Rell*, 611 F. App'x 22, 26 (2d Cir. 2015) (rejecting prisoner's argument that summary judgment is premature for failure of the prisoner to identify "any specific discoverable information he hoped to obtain by his discovery requests that would have raised a material issue of fact"); *see also Jones v. New York State Metro D.D.S.O.*, 543 F.

App'x 20, 23 (2d Cir. 2013) (no abuse of discretion when denying motion to compel discovery where *pro se* plaintiff did not show how requests would create a genuine issue of material fact).

Milner also argues that the defendants obstructed him from utilizing the grievance process "through machination, misrepresentation, [and] intimidation." Doc. #51 at 16. But Milner does not expound on this otherwise conclusory allegation.

In sum, as to Milner's claim that he was denied necessary medication for the time period when he arrived at HCC on April 13, 2018 to the date six days later when he filed his grievance on April 19, 2018, there is a genuine issue of material fact as to whether he properly exhausted his administrative remedies. As to his other claims involving actions of the defendants that occurred *after* April 19, 2018, there is nothing in the record to suggest that he exhausted his administrative remedies as required under the PLRA.

Although the complaint alleges that Milner alerted "Nurse Diane" on April 13, 2018 about his medication deprivation, Doc. #1-1 at 6 (¶ 15), the Court was not able to identify a "Nurse Diane" or "Nurse Denise" for purposes of service of process, and Milner failed to carry his burden to identify the correct defendant for service. Doc. #25. To the extent that Milner alleges that he notified defendants Warden Black and Lieutenant Rivera of his seizure that occurred on April 17, 2018, Doc. #1-1 at 7 (¶ 19), he alleges no further facts to suggest that these two non-medical defendants were made aware at the time of any denial of medications that he believed responsible for the seizure event of April 17. The remainder of the complaint alleges misconduct by one or more of the defendants *after* April 19, 2018, including misconduct surrounding an alleged seizure on April 28 that resulted in Milner's alleged placement by Nurse Joe in a cell without clothing. Doc. #1-1 at 8-11 (¶¶ 21-36). None of these claims were properly exhausted.

Accordingly, I will grant the defendants' motion for summary judgment as to all of Milner's claims concerning alleged misconduct occurring after April 19, 2018. Because there is no genuine issue of fact to show that any of the alleged misconduct engaged in by defendants Warden Black and Nurses Chris, Denise, Joe, and Michael occurred on or before April 19, 2018, and/or that their alleged misconduct concerned the subject matter of Milner's grievance of April 19, 2018 concerning his non-receipt of medications in the proper amount, I will grant each of these defendants' motions for summary judgment.

On the other hand, as to Milner's claim against Dr. Laplante for her alleged failure to prescribe the correct dosage of medications upon Milner's admission to HCC on April 13, 2018, I conclude that there is a genuine fact issue whether this claim was properly exhausted, and I also conclude as to the nature of this particular claim that there is a genuine fact issue whether it amounts to a complaint of a specific and continuing violation that would allow for liability against Dr. Laplante to be predicated on post-grievance conduct. *See White v. Velie*, 709 F. App'x 35, 36 (2d Cir. 2017). In view of these genuine fact issues as to exhaustion with respect to Milner's claim against Dr. Laplante, I will address the merits of the parties' summary judgment motions for this claim below.

### *Deliberate indifference to serious medical needs*

The Fourteenth Amendment due process clause protects the rights of pretrial detainees against intentional or deliberate indifference to their serious medical needs or unsafe conditions of confinement. In order to establish such a claim, a plaintiff must show that: (1) his conditions of confinement *objectively* "pose an unreasonable risk of serious damage to his health," and (2) the official *subjectively* "acted intentionally to impose the alleged condition, or recklessly failed to act with the reasonable care to mitigate the risk that the condition posed to the pretrial detainee

13

even though the defendant-official knew, or should have known, that the condition posed an excessive risk to health or safety." *Darnell v. Pineiro*, 849 F.3d 17, 30, 35 (2d Cir. 2017); *see also Charles v. Orange Cty.*, 925 F.3d 73, 86-87 (2d Cir. 2019) (applying same two-part objective/subjective standard to detainee's claim for deliberate indifference to serious medical needs under the Fourteenth Amendment).

The record shows that Milner was initially admitted to Bristol Hospital on April 11, 2018, after he showed seizure-like symptoms following his arrest by the police when he tried to break into a police car. Doc. #45 at 15, 18, 22. One of the hospital's specialist neurologists—Dr. Cara Pittari—wrote that "I cannot be sure that all of his seizure episodes are epileptic seizures and cannot rule out that some may be nonepileptic spells." *Id.* at 18. Milner reported that he stopped taking all his seizure medications about five days before because of depression about his epilepsy. *Id.* at 15.

Milner told Dr. Pittari at the Bristol Hospital that he had previously taken twice daily doses of 125 milligrams of Dilantin and 1500 milligrams of Keppra. *Ibid.* On April 12, 2018, Dr. Pittari wrote that Milner "should be on 1500 mg twice a day" of Keppra as well as to "continue on the 125 mg twice a day" of Dilantin. *Id.* at 18. These amounts were reflected in the hospital discharge instructions when Milner was released to HCC the following day. *Id.* at 10-11, 22-23. They are also a part of Milner's prison medical file, and there has been no suggestion that the Bristol Hospital discharge records were not available to Dr. Laplante at HCC.

The record includes a "Physician's Orders" form from HCC that is dated April 13, 2018. Doc. #45 at 2. The form reflects that Dr. Laplante issued a prescription that day for Milner to take 300 milligrams of Dilantin once daily and 750 milligrams of Keppra twice daily. *Ibid.* These amounts prescribed by Dr. Laplante are *different* than the dosage amounts recommended by the

discharge instructions from Bristol Hospital, including only half as much Keppra as previously prescribed.

According to Milner, Dr. Laplante "interfered with the treatment already prescribed to [him] by underdosing him on his Keppra by cutting the dose from 1500mg to 750mg, and overdosing him on his Dilantin by increasing it from 125mg to 300mg." Doc. #51 at 4 (¶ 6).[6] He further attests that Dr. Laplante did not see him at all on April 13, 2018 and that he was never seen by a doctor while at HCC. Doc. #1-1 at 7 (¶ 17); Doc. #51 at 4 (¶ 6); Doc. #51-1 at 54 (¶ 3). Milner claims that because of the lack of proper seizure medication, he suffered a major seizure on April 17 or 18, 2018. Doc. #1-1 at 7 (¶ 18); Doc. #51-1 at 59 (¶ 34).

According to Milner, Dr. Laplante should have known the proper amount to prescribe not only on the basis of the Bristol Hospital discharge records but also on the basis of DOC records reflecting nearly the same amounts of anti-seizure medications prescribed to Milner in 2016 when he was previously in DOC custody. Doc. #54 at 4 (¶ 15), 22, 34. Milner has also submitted a DOC document from April 2016 including a DOC staff statement that that Milner has a "known hx of seizures and medication" and that he was "observed having a seizure (convulsions) by custody, and medical staff," necessitating that he be "transported to the medical dept via stretcher." Doc. #51 at 65.

Dr. Laplante has submitted an affidavit in support of her motion for summary judgment. Her affidavit states that "I do not recall my interaction with the plaintiff on April 13, 2018" and adds that "I wrote prescriptions for the plaintiff for Dilantin and Keppra." Doc. #44-5 at 2 (¶ 4). She further states that she prescribed 300 milligrams per day of Dilantin and that this "is the initial dosage recommended for Dilantin." *Ibid.* (¶ 5). Similarly, she states that she prescribed

---

[6] Milner overstates the alleged overdose of Dilantin. As indicated above, the record reflects that Bristol Hospital prescribed 250 milligrams per day (125 milligrams twice per day).

15

750 milligrams of Keppra to be taken twice a day and that "[t]his dosage is higher than the initial dosage recommended for Keppra, which is 500 milligrams, twice daily." *Ibid.* Dr. Laplante's affidavit goes on to state her belief that Milner was provided with these medications and that they were appropriate "as the plaintiff did not suffer any legitimate seizure activity during his time at HCC." *Id.* at 3 (¶¶ 6-7).[7]

In light of this factual record, I will assume for present purposes that there is at least a genuine fact issue that Milner's seizure disorder is sufficiently serious to meet the objective prong for a deliberate indifference claim. *See, e.g.*, *Harrington v. Vadlamudi*, 2016 WL 4570441, at *7 (N.D.N.Y. 2016) (citing seizure disorder cases). This leaves for consideration whether there is a genuine fact issue to show that Dr. Laplante acted recklessly toward Milner.

I will start with the standard that governs my evaluation of recklessness in the prison medical context. "It is well-established that mere disagreement over the proper treatment does not create a constitutional claim," and that "negligence, even if it constitutes medical malpractice, does not, without more, engender a constitutional claim." *Chance v. Armstrong*, 143 F.3d 698, 703 (2d Cir. 1998). "Thus, mere medical malpractice is not tantamount to deliberate indifference, but it may rise to the level of deliberate indifference when it involves culpable recklessness, i.e., an act or a failure to act ... that evinces a conscious disregard of a substantial risk of serious harm." *Charles*, 925 F.3d at 87 (internal quotations omitted).

Viewing the facts in the light most favorable to Milner (which I must do for purposes of evaluating the defendants' summary judgment motion), I conclude that the evidence is enough to create a genuine fact issue as to whether Dr. Laplante acted with recklessness above and beyond simple negligence. First, Milner asserts without contradiction that Dr. Laplante never met or

---

[7] The parties dispute whether Milner has faked seizures. This is plainly a fact issue that the Court cannot resolve in either party's favor at the summary judgment stage.

16

spoke with him before prescribing the amounts of anti-seizure medication that she did. Dr. Laplante states in her affidavit that she does not "recall" her "interaction" with Milner, without affirmatively asserting that she actually did meet with him or that she invariably meets with a prisoner before prescribing anti-seizure medications.

Second, Dr. Laplante's affidavit does not contradict Milner's claim that Dr. Laplante chose the dosage amounts without reference to his history as shown in the Bristol Hospital discharge records and prior DOC records. The affidavit suggests that Dr. Laplante chose the dosage amounts based only on the "initial dosage" amounts that are generally recommended for Dilantin and Keppra rather than the amounts that would be specifically appropriate for a patient like Milner who has a long history of a seizure disorder and taking anti-seizure medications.

To be sure, the Second Circuit has rejected arguments that a prison doctor is necessarily deliberately indifferent if the doctor chooses a different treatment regime than the regime prescribed by the prisoner's former health provider. *See, e.g.*, *O'Connor v. McArdle*, 217 F. App'x 81, 83 (2d Cir. 2007) ("Although in certain instances, a physician may be deliberately indifferent if he or she consciously chooses an easier and less efficacious treatment plan than otherwise available, failure to provide the more efficacious treatment—even where, as here, a doctor recommends the treatment at plaintiff's insistence—does not, without more, rise to the level of deliberate indifference.") (internal quotations and citations omitted); *McGann v. Coombe*, 131 F.3d 131 (2d Cir. 1997) (noting that "[t]he allegations based on defendants' alleged refusal to provide orthopedic footwear for McGann fall short of stating a claim," because "[w]hile McGann's podiatrist may have prescribed orthopedic shoes, Dr. Tehrany decided, instead, to prescribe medication to treat McGann's underlying condition," and "[t]his difference

in opinion implies nothing more than a difference in medical judgment and does not state a claim of deliberate indifference").

But such rulings presuppose that the prison doctor has considered the prisoner's medical history and the views of the prisoner and nonetheless exercised independent medical judgment to adopt a different medication or treatment regime. Milner's case is closer to *Johnson v. Wright*, 412 F.3d 398 (2d Cir. 2005), in which Second Circuit concluded that there was a genuine issue of fact with respect to a prisoner's claim that prison officials should not have denied a prisoner a particular prescription "in the face of the unanimous, express, and repeated—but contrary—recommendations of plaintiff's treating physicians, including prison physicians." *Id.* at 400.

If Milner's version is credited, Dr. Laplante prescribed medication for a dangerous health condition without ever talking to him or reviewing readily available medical records indicating that a significantly different amount be prescribed for Milner's protection. In the context of the evident risks posed by a seizure condition, that is enough to create a genuine fact issue about whether Dr. Laplante acted in a manner "that evinces a conscious disregard of a substantial risk of serious harm." *Charles*, 925 F.3d at 87. So I will deny Dr. Laplante's motion for summary judgment.

Having concluded that I must deny Dr. Laplante's motion for summary judgment, I now turn to Milner's cross-motion for summary judgment. For purposes of Milner's cross-motion, I must of course view the facts in the light most favorable to Dr. Laplante rather than to Milner. I have already concluded that Milner failed to exhaust his remedies as to all of the defendants except for Dr. Laplante, and this conclusion remains unchanged. As to Dr. Laplante, when I view the facts in the light most favorable to her and taking consideration of her assertion that she had a sound medical basis to prescribe the amounts of anti-seizure medications for Milner that she did,

I conclude that Milner has not conclusively established that Dr. Laplante acted recklessly. A genuine fact issue remains on the issue of recklessness.

This action shall proceed to trial on Milner's claim against Dr. Laplante under the Fourteenth Amendment for deliberate indifference to Milner's serious medical needs. To the extent that Milner has separately complained that Dr. Laplante did not prescribe him pain medication, I need not separately address that issue at this time in view of my conclusion that there is sufficient evidence for Milner to proceed to trial on his major claim with respect to anti-seizure medication and in view of the high likelihood that the trial evidence will embrace the full range of Dr. Laplante's prescriptions and relationship with Milner while he was at HCC.

## CONCLUSION

For the foregoing reasons, the defendants' motion for summary judgment (Doc. #80) is GRANTED in part and DENIED in part. The motion is granted as to defendants Warden Allison Black, Lieutenant Rivera, Nurse Chris, Nurse Denise, Nurse Joe, and Nurse Michael for failure to exhaust administrative remedies. The motion is denied as to defendant Dr. Sharron Laplante with respect to plaintiff Shawn Milner's claim under the Fourteenth Amendment for deliberate indifference to his serious medical needs. Plaintiff Shawn Milner's cross-motion for summary judgment (Doc. #84) is DENIED.

It is so ordered.

Dated at New Haven this 24th day of February 2020.

/s/ *Jeffrey Alker Meyer*
Jeffrey Alker Meyer
United States District Judge